**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 18-cv-23912-RNS

MARTHA PHILLIPS, JERRY PHILLIPS,
DARREN BROWN, ROSEMARY ELIAS
and LUIS PEREZ-HERNANDEZ,
on behalf of themselves and all others
similarly-situated,

   Plaintiffs,

v.              **CLASS ACTION COMPLAINT**

NCL CORPORATION LTD d/b/a     **JURY DEMAND**
NORWEGIAN CRUISE LINES,
a foreign corporation,

   Defendant.
_____/

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

   Plaintiffs, Martha Phillips ("Mrs. Phillips"), Jerry Phillips ("Mr. Phillips"), Darren Brown ("Mr. Brown"), Rosemary Elias ("Mrs. Elias") and Luis Perez-Hernandez ("Mr. Perez-Hernandez") (collectively, "Plaintiffs") bring this action against Defendant NCL Corporation LTD d/b/a Norwegian Cruise Lines ("Norwegian") on behalf of themselves and a putative class of other similarly-situated consumers who paid a concealed kickback to Norwegian when they purchased travel insurance policies offered through Norwegian's "Booksafe Travel Protection Plan."

**INTRODUCTION**

   1.  Over the past few years, a number of states and insurance regulators have conducted extensive investigations into the travel insurance industry, including its use of "distribution participants" to solicit the purchase of travel insurance. These regulators have identified a number of unfair and deceptive marketing and sales tactics used to sell "travel insurance," including the

payment of undisclosed kick-backs to the "distribution participant" for every travel insurance policy sold, which are unwittingly funded by consumers. These undisclosed kick-backs are further concealed by the distribution participant's practice of bundling the insurance product together with other, non-insurance products for a single price, while at the same time giving the impression that the insurance product is being purchased by the consumer on a pass-through basis from the insurer.

2.      As a result of the regulatory investigations into these practices, various insurance companies offering travel insurance products, including specifically Transamerica Casualty Insurance Company ("Transamerica") and Nationwide Mutual Insurance Company ("Nationwide"), have entered into multi-state regulatory settlement agreements agreeing to cease these unfair and deceptive practices. However, none of these regulatory agreements have afforded relief directly to victimized consumers, nor have they prevented distribution participants, such as Norwegian, from continuing to engage in these highly misleading – but highly lucrative – business practices.

3.      Very recently, Senator Edward J. Markey of Massachusetts released a report on his investigation into many of these unfair and deceptive practices in the context of the online travel insurance industry.[1] The criticisms voiced in Senator Markey's report include concerns that online travel insurance solicitations (1) offer only bare-bones travel insurance coverage with extensive exclusions; (2) utilize an online marketing process that encourages and pressure consumers to

---

[1] Flyer Beware: Is Travel Insurance Worth It?: Senator Markey releases new report that details questionable travel insurance marketing practices for policies that overpromise and under-deliver, (August 21, 2018), https://www.markey.senate.gov/news/press-releases/flyer-beware-is-travel-insurance-worth-it (last accessed August 24, 2018); Flyer Beware: Is Travel Insurance Worth It? (August 2018) https://www.markey.senate.gov/imo/media/doc/Flyer%20Beware%20Report.pdf (last accessed August 24, 2018).

purchase travel insurance policies; and (3) generate undisclosed fees that inflate the price of every travel insurance policy sold.

4.       As alleged in detail below, Norwegian has engaged in precisely these unfair and deceptive practices on a nationwide basis from its headquarters in Miami, Florida, through its on-line marketing and selling of travel insurance policies in its "Booksafe Travel Protection Plan" ("BTPP"). The purpose of this action is: (1) to compensate Plaintiffs and other victimized consumers for Norwegian's unfair and deceptive practices as a distribution participant in the sale of travel insurance, and (2) to put an end to Norwegian's use of such unfair and deceptive sales practices.

5.       Specifically, Norwegian's BTPP includes the offer of a travel insurance policy ("Travel Insurance Policy"), issued (a) before October 1, 2017, by Transamerica or its affiliates ("the Transamerica Policy") and (b) after October 1, 2017 by Nationwide or its affiliates ("the Nationwide Policy"). Norwegian's website and other BTPP materials clearly state that the Travel Insurance Policy is independently underwritten by Transamerica or later Nationwide. Moreover, to obtain information about the Travel Insurance Policy, Norwegian's website directs consumers through hyperlinks to a non-Norwegian website (https://affinitytravelcert.com/), which states on the website header "Aon Affinity" ("Aon"), who is the managing general agent for Transamerica and Nationwide.

6.       A reasonable consumer, like Plaintiffs, would thus believe that they are contracting directly with Transamerica or Nationwide for the purchase of the Travel Insurance Policy, and that the premium for that Travel Insurance Policy is passed through to Transamerica or Nationwide by Norwegian from the price of the BTPP.

7.     In reality, Norwegian receives an undisclosed kickback from Transamerica, Nationwide or Aon for every Travel Insurance Policy sold through its BTPP. One type of undisclosed kickback are unearned commissions. Another type of undisclosed kickback is that after every Travel Insurance Policy is sold, the Insurer then reinsures the risk of those policies with Norwegian's Producer-Owned Reinsurance Company ("PORC"), also known as a "captive reinsurer," the identity of whom discovery will reveal (the "Reinsurance Scheme").

8.     The Reinsurance Scheme was manufactured, designed and implemented by Norwegian, its PORC, the Insurer and its agents, and was conceived to prey upon consumers' lack of choice in the voluntary travel insurance market to reap excessive and unfair gains that escape the watchful eyes of the consuming public and the insurance commissioners of all 50 states. Discovery will more fully reveal and explain that after each Travel Insurance Policy is sold by the Insurer, the Insurer reinsures the Travel Insurance Policy pursuant to a quota-share reinsurance treaty that allows the Insurer to transfer almost 100% of the amounts paid for the Travel Insurance Policies to Norwegian's PORC, and subsequently to Norwegian. The PORC is essentially a mailbox with no real duties or staff, and is formed mainly to accept the funds for reinsuring the Insurer's portfolio of Travel Insurance Policies. Because these Travel Insurance Policies (the amount of premiums collected vs. the amount of claims paid out) of 5–15% of every dollar paid, the sale of the Travel Insurance Policies essentially acts as a massive riskless profit generator. This is never disclosed to the consumers, who are misled into believing that the sale of the Travel Insurance Policy is in their best interest, and the money paid for the Travel Insurance Policy is collected by Norwegian and then passed through to the Insurer, from whom consumers purchase the Travel Insurance Policy.

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

9.      Norwegian unfairly and deceptively conceals these kickbacks and the fact that consumers are unwittingly funding the kickbacks, while at the same time misleading consumers into the mistaken impression that the Travel Insurance Policy is in their best interest. Moreover, Norwegian unfairly and deceptively conceals the kickbacks by representing that the cost of the Travel Insurance Policies as pass-through charges when in fact they keep the lion's share of the charges for themselves, either through unearned commissions or through the Reinsurance Scheme. A similar form of reinsurance kickback scheme was uncovered before this Court in *Bowe v. Public Storage*, 106 F.Supp.3d 1252, 1258–59, 1270 (S.D. Fla. 2015) (describing the Public Storage reinsurance kickback scheme and concluding that "a reasonable fact finder could find it was a deceptive practice for Public Storage to represent that the premiums would be 'passed through' to the insurance company and then secretly retain a portion of the insurance premium for itself."). The Reinsurance Scheme is implemented in the exact same manner to all similarly-situated class members, and is directly quantifiable as damages under the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201, *et seq.*, Florida Statutes ("FDUTPA"), as interpreted by the Courts.

10.     Plaintiffs accordingly seek relief for themselves and on behalf of a putative nationwide class of other similarly-situated consumers who purchased a Travel Insurance Policy through Norwegian's BTPP ("the Class") under the FDUTPA, as well as for unjust enrichment. Alternatively, Plaintiffs seek relief for a statewide subclass under the FDUTPA and unjust enrichment. Finally, Plaintiffs also seek declaratory and injunctive relief to put an end to Norwegian's unfair and deceptive kickback practices.

11.     Plaintiffs are not suing under any cruise ticket contract with Norwegian, which bears no significant relationship to this lawsuit such that none of its provisions apply to Plaintiffs' claims. Plaintiffs' claims do not require any reference to, or construction of any portion of the

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

Ticket Contract and more importantly, Plaintiffs hereby agree that they will never need to or in fact refer to any provision of the Ticket Contract to prove any of their asserted claims and resulting damages to the jury in this matter. In fact, this lawsuit has nothing to do with cruises, let alone the cruise ticket contract. This action solely relates to Norwegian's business practices concerning its omissions relating to the independent sale of the Travel Insurance Policies and the remuneration Norwegian receives as a distribution participant in that sale, through unearned commissions from the Insurer or through the Reinsurance Scheme.

## PARTIES, JURISDICTION, AND VENUE

12.     Plaintiff Mrs. Phillips is, and at all material times was, an individual who resides in and is a citizen of Peach County, Georgia. Mrs. Phillips is over the age of 18 and is *sui juris*. Mrs. Phillips purchased a Travel Insurance Policy through Norwegian's BTPP on or about April 12, 2017.

13.     Plaintiff Mr. Phillips is, and all material times was, an individual who resides in and is a citizen of Peach County, Georgia. Mr. Phillips is over the age of 18 and is *sui juris*. Mr. Phillips purchased a Travel Insurance Policy through Norwegian's BTPP on or about April 12, 2017.

14.     Plaintiff Mr. Brown is, and all material times was, an individual who resides in and is a citizen of Indian River County, Florida. Mr. Brown is over the age of 18 and is *sui juris*. Mr. Brown purchased a Travel Insurance Policy through Norwegian's BTPP on or about October 10, 2016.

15.     Plaintiff Mrs. Elias is, and all material times was, an individual who resides in and is a citizen of Miami-Dade County, Florida. Mrs. Elias is over the age of 18 and is *sui juris*. Mrs. Elias purchased a Travel Insurance Policy through Norwegian's BTPP on or about March 1, 2017.

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

16.     Plaintiff Mr. Perez-Hernandez is, and all material times was, an individual who resides in and is a citizen of Miami-Dade County, Florida. Mr. Perez-Hernandez is over the age of 18 and is *sui juris*. Mr. Perez-Hernandez purchased a Travel Insurance Policy through Norwegian's BTPP on or about March 1, 2017.

17.     Defendant Norwegian, is a corporation and citizen of Florida, with its self-proclaimed "world headquarters" and principal place of business located 7665 Corporate Center Drive, Miami, FL, 33126. Norwegian does business regularly throughout the United States, including and from within the state of Florida.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is an action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the defendant.

19.     This Court has personal jurisdiction over Norwegian because it continuously and systematically operates, conducts, engages in, and carries on business in Florida. Upon information and belief, Norwegian's United States business operations (including specifically its functioning as a distribution participant for travel insurance) are controlled, directed, and for the most part carried out in Miami, Florida.

20.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b) and § 1391(c) because Norwegian resides in this district for purposes of the statute.

21.     Norwegian is subject to the personal jurisdiction of this Court for purposes of this action.

## COMMON ALLEGATIONS

22.     Norwegian operates at least 15 ships with a combined capacity for 46,555 passengers, sailing to destinations including the Caribbean, Cuba, the Bahamas, Mexican Riviera,

Alaska, Hawaii, the Pacific Coast, Panama Canal, Bermuda, Canada, New England, South America, Australia, New Zealand, Europe, Asia, and Florida.[2] In 2018, Norwegian was estimated to hold an 8.4% share of cruise industry revenue (or $3,898,000,000.00) and 8.7% of passengers (or 2,269,800).[3]

23.     At all material times, Norwegian's website (http://www.NCL.com) prompts customers to elect whether to purchase the BTPP, which necessarily includes a Travel Insurance Policy, in a separate, independent transaction. Similarly, Norwegian agents over the phone will require a customer to elect whether to purchase the BTPP, which necessarily includes a Travel Insurance Policy, pursuant to a standard script. A copy of the BTPP along with specimens of the Transamerica Policy and the Nationwide Policy are attached as Composite Exhibit A.

24.     The Transamerica Policy and the Nationwide Policy each offer extremely limited coverage, operating as little more than an excess policy that pays <u>secondary</u> to "Other Valid and Collectible Group Insurance" or "indemnity." *See* Composite Exhibit A.

25.     Norwegian marketed the BTPP and the Travel Insurance Policies to its customers in a uniform fashion, such that when purchasing travel insurance the customer is exposed to the same marketing language soliciting the sale of the Travel Insurance Policy.

26.     In making the Travel Insurance Policy available to customers, Norwegian does not hold itself out as the seller or issuer of the Travel Insurance Policy. Norwegian simply facilitates the sale of the Travel Insurance Policy as a distribution participant, by including it in the BTPP.

---

[2] Gene Sloan, *The fleet and home ports of Norwegian Cruise Line, by the numbers*, USA Today, September 5, 2017, https://www.usatoday.com/story/travel/cruises/2017/09/05/fleet-and-home-ports-norwegian-cruise-line-numbers/632134001/ (last visited Sep 19, 2018).

[3] https://www.cruisemarketwatch.com/market-share/ (last accessed September 19, 2018).

27.     At the same time Norwegian marketed the BTPP to its customers, however, it was receiving a kickback in the form of, *inter alia*, an undisclosed, unearned commission on the sale of the Travel Insurance Policies. Norwegian further receives undisclosed kickbacks for the sale of the Travel Insurance Policies through, among other things, undisclosed, unearned commissions, and/or through ceded premiums taken as a result of the Reinsurance Scheme described at ¶¶ 7–9, *supra*. Norwegian deliberately omitted any disclosure of these kickbacks to Plaintiffs and the other members of the Class. Norwegian's marketing practices were and are deceptive and unfair.

28.     Norwegian furthermore uses the BTPP to further conceal its undisclosed profits in the sale of the Travel Insurance Policies, by bundling the insurance and non-insurance products into a single price package. Specifically, the BTPP is an amalgamation of three separate products offered for sale by three separate entities:

- The Cancellation Fee Waiver Program, <u>a non-insurance product</u> <u>provided by Norwegian</u>. If a purchaser canceled her cruise for a covered reason, Norwegian would waive its cancellation fee and refund the unused portion of the cruise.

- The Travel Insurance Policy <u>an insurance product</u> <u>provided by Transamerica or Nationwide</u>.

- The Carefree Worldwide Emergency Assistance Program, <u>a non-insurance product provided by On Call International</u>.

29.     Although the BTPP was and is sold for one consolidated price, it was and is marketed as being comprised of three separate products, only one of which was provided by Norwegian, while the other two were provided by two different entities. Therefore, a reasonable consumer was misled into believing that the price she pays for the BTPP is comprised of three "pass-through" charges, which Norwegian simply collects and passes-through to each respective provider: a charge from Norwegian for the Cancellation Fee Waiver, a pass-through charge from

Transamerica or Nationwide for the Travel Insurance Policy, and a pass-through charge from On Call International for the Travel Assistance Program.

30.     By bundling the Travel Insurance Policy into the BTPP, Norwegian is able to further conceal the fact that consumers were being vastly overcharged for the Travel Insurance Policy due to the kickbacks Norwegian received for every Transamerica Insurance Policy sold through its BTPP.

31.     At all material times, Norwegian aggressively marketed the BTPP to its customers while concealing its profit interest in the sale of the Travel Insurance Policy. These marketing practices were deceptive and unfair.

32.     Despite aggressively marketing the BTPP, Norwegian has never disclosed that it receives a profit based on the sale of the Travel Insurance Policy, and has never disclosed the Reinsurance Scheme that results in Norwegian retaining almost the entire premium paid. Indeed, in its BTPP marketing materials, Norwegian differentiated that while the Cancellation Fee Waiver Program is "provided by Norwegian Cruise Lines," the Travel Insurance Policy is underwritten by the Insurer, without more.

33.     Through these misleading marketing materials, objective consumers would reasonably infer that when they purchased a BTPP, the funds to cover the Travel Insurance Policy's cost were transmitted to the Insurer, who Norwegian identified as the company offering the Travel Insurance Policy for sale to the customer.

34.     In reality, and completely unbeknownst to the consumer, the price charged for the Travel Insurance Policy was inflated because, in addition to charging the premium for the Travel Insurance Policy, Norwegian charged and received the undisclosed, unearned commission from

the Insurer in exchange for making the Insurer the exclusive travel insurance provider for the BTPP.

35.     Moreover, the Reinsurance Scheme is never disclosed to consumers. It is never disclosed to consumers that the Insurer reinsures the Travel Insurance Policy premiums through Norwegian's PORC, which results in nearly 100% of the premiums and risk being transferred to Norwegian. As explained above, *see* ¶¶ 7–9, *supra*, because the Travel Insurance Policy has an extremely low loss ratio, the Reinsurance Scheme insures that the sale of each Travel Insurance Policy results in almost pure profit to Norwegian, when consumers are misled into believing they are purchasing insurance from the Insurer.

36.     Thus, by offering the Travel Insurance Policy through the BTPP, Norwegian created for itself a massive hidden profit-center. These unfair and deceptive practices affect every consumer that purchases the Travel Insurance Policy in the exact same manner and results in a direct loss for each consumer, which is quantifiable and collectible under FDUTPA.

37.     In short, Norwegian has, through omission, engaged in a pattern of unlawful profiteering, deceit, and self-dealing with regard to the Travel Insurance Policies.

38.     Recently, travel insurers around the country, including both Transamerica and Nationwide, have entered into multi-state regulatory settlement agreements regarding their unfair and deceptive practices in the marketing of travel insurance. Attached as Composite Exhibit B are copies of the multi-state regulatory agreements Transamerica entered into on December 15, 2017 and Nationwide entered into on January 3, 2018.

39.     A condition of Transamerica's multi-state regulatory agreement required Transamerica to <u>exit the travel insurance industry entirely</u> for five years as a result of the unfair

and deceptive business practices Transamerica employed and allowed its distribution partners, such as Norwegian, to employ.

40. Under the regulatory settlements, the unfair and deceptive practices travel insurers have agreed will no longer be used include:

- combining and packaging the cost of Assistance Services or Travel Cancellation Fee Waivers with the cost of Travel Insurance in its rate filings and in the sale of Travel Insurance to consumers;
- allowing Distribution Participants to combine and package the cost of Assistance Services or Travel Cancellation Fee Waivers with the cost of Travel Insurance when offering these products and services for sale; and
- charging a separate fee for travel insurance in addition to the travel insurance premium or add any charges or fees for any of the travel insurance products or related services without a separate written agreement with the insured.

*See* Composite Exhibit B.

41. Throughout the Class Period, Norwegian engaged in these practices in the marketing and sale of the Travel Insurance Policy through Norwegian's BTPP. Since Nationwide and Transamerica entered into these multi-state regulatory agreements, Norwegian has in some instances modified its website's functionality and marketing materials to attempt to conform to their requirements. Discovery will reveal the timing of these changes and past versions of Norwegian's website that utilized highly deceptive and unfair tactics to mislead consumers into purchasing the Travel Insurance Policy so that Norwegian could unfairly profit at consumers' expense.

42. Although Transamerica has exited the travel insurance industry as of December 31, 2017, since October 2017 Norwegian has offered the Nationwide Policy in its BTPPs, still utilizes

the deceptive and unfair marketing and sales practices outlined in this Complaint, and is still receiving substantial kickbacks for every Travel Insurance Policy sold through its BTPP.

43.    Norwegian has never disclosed to Plaintiff, or any of the class members, the true nature of its relationship with Transamerica or Nationwide. Specifically, Norwegian never disclosed the fact that it received substantial kickbacks on the Transamerica Policy that Norwegian offered for sale with the BTPP. Nor has Norwegian ever disclosed that it is still receiving substantial kickbacks on every Travel Insurance Policy it sells.

44.    The BTPP (and certainly the Travel Insurance Policies) would have been offered to Plaintiffs at a lower price but for the kickbacks paid to Norwegian.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### i.    **Martha and Jerry Phillips**

45.    On or about April 12, 2017, Mr. and Mrs. Phillips purchased a Norwegian BTPP containing the Transamerica Policy for $218.00. *See* Exhibit C.

46.    On the date that Mr. and Mrs. Phillips purchased the BTPP, they did not know about Norwegian's kickback schemes. Mr. and Mrs. Phillips would not have purchased the BTPP had they known that the price of the BTPP or Travel Insurance Policy was inflated because of the kickbacks from Transamerica, Nationwide or Aon to Norwegian in exchange for placement as the exclusive travel insurance providers for Norwegian. Instead, Mr. and Mrs. Phillips would have purchased a stand-alone insurance policy from another insurer, or self-insured.

47.    The BTPP (and certainly the Travel Insurance Policy) would have been offered at a lower price but for the kickbacks to Norwegian.

48.    As a consequence of purchasing the Travel Insurance Policy, Mr. and Mrs. Phillips lost money in the form of the overcharges paid as a result of the kickbacks to Norwegian.

49.     Moreover, as a result of the undisclosed Reinsurance Scheme, Mr. and Mrs. Phillips were damaged by paying what was misrepresented to them to a be a "pass-through" charge for the Travel Insurance Policy to the Insurer, when in reality Norwegian ultimately kept most of the money.

### ii.     Darren Brown

50.     On or about October 10, 2016, Mr. Brown purchased a Norwegian BTPP containing the Transamerica Policy for $198.00. *See* Exhibit D.

51.     On the dates that Mr. Brown purchased the BTPP, he did not know about Norwegian's kickback scheme. Mr. Brown would not have purchased the BTPP had he known that the price of the BTPP or Travel Insurance Policy was inflated because of the kickbacks from Transamerica, Nationwide or Aon to Norwegian in exchange for placement as the exclusive travel insurance providers for Norwegian. Instead, Mr. Brown would have purchased a stand-alone insurance policy from another insurer, or self-insured.

52.     The BTPP (and certainly the Travel Insurance Policy) would have been offered at a lower price but for the kickbacks to Norwegian.

53.     As a consequence of purchasing the Travel Insurance Policy, Mr. Brown lost money in the form of the overcharges paid as a result of the kickbacks to Norwegian.

54.     Moreover, as a result of the undisclosed Reinsurance Scheme, Mr. Brown was damaged by paying what was misrepresented to him to a be a "pass-through" charge for the Travel Insurance Policy to the Insurer, when in reality Norwegian ultimately kept most of the money.

### iii.     Rosemary Elias and Luis Perez-Hernandez

55.     On or about March 1, 2017, Mrs. Elias and Mr. Perez-Hernandez purchased a Norwegian BTPP containing the Transamerica Policy for $118.00. *See* Exhibit E.

56.     On the date that Mrs. Elias and Mr. Perez-Hernandez purchased the BTPP, they did not know about Norwegian's kickback scheme. Mrs. Elias and Mr. Perez-Hernandez would not have purchased the BTPP had they known that the price of the BTPP or Travel Insurance Policy was inflated because of the kickbacks from Transamerica, Nationwide or Aon to Norwegian in exchange for placement as the exclusive travel insurance providers for Norwegian. Instead, Mrs. Elias and Mr. Perez-Hernandez would have purchased a stand-alone insurance policy from another insurer, or self-insured.

57.      The BTPP (and certainly the Travel Insurance Policy) would have been offered at a lower price but for the kickbacks to Norwegian.

58.     As a consequence of purchasing the Travel Insurance Policies, Mrs. Elias and Mr. Perez-Hernandez lost money in the form of the overcharges paid as a result of the kickbacks to Norwegian.

59.     Moreover, as a result of the undisclosed Reinsurance Scheme, Mrs. Elias and Mr. Perez-Hernandez were damaged by paying what was misrepresented to them to a be a "pass-through" charge for the Travel Insurance Policy to the Insurer, when in reality Norwegian ultimately kept most of the money.

**CLASS ACTION ALLEGATIONS**

60.     Plaintiffs bring this Complaint as a class action pursuant to Federal Rule of Civil Procedure 23.

**A.  <u>Class Definitions</u>**

61.     Plaintiffs bring this action against Norwegian on behalf of themselves and all other persons similarly-situated. Plaintiffs seek to represent the following nationwide class:

> All persons who, within the applicable limitations period, purchased a Travel Insurance Policy through Norwegian's Booksafe Travel Protection

Plan. Excluded from this class are Norwegian, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees ("the Class").

62.     Alternatively, Plaintiffs seek the certification of the following subclass for residents of the state of Florida:

### A. <u>Florida subclass:</u>

All Florida persons who, within the applicable limitations period, purchased a Travel Insurance Policy through Norwegian's Booksafe Travel Protection Plan. Excluded from this class are Norwegian, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

63.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before or after the Court determines whether such certification is appropriate. In particular, Plaintiffs may amend the complaint to join in additional consumers from other states in order to seek the certification of additional statewide classes or subclasses.

64.     Norwegian has subjected Plaintiffs and the members of the Class to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above was Norwegian's standardized and uniform business practice.

### B. <u>Numerosity</u>

65.     The individual class members are so numerous that joinder of all members in a single action is impracticable. Norwegian operates thousands of cruises a year, and upon information and belief, it has sold thousands of Travel Insurance Policies during the Class Period.

66.     The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Norwegian. The precise number of Class members number at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any

difficulties in the management of the action as a class action.

### C.  **Commonality/Predominance**

67.    Common questions of law and fact exist as to Plaintiffs' and the Class members'

claims. These common questions predominate over any questions solely affecting individual Class

members, including, but not limited to, the following:

   a.  Whether Norwegian engaged in a deceptive and unfair business practice by omitting disclosure of its financial interest in offering and selling the Travel Insurance Policies for the Insurer;

   b.  Whether Norwegian engaged in a deceptive and unfair business practice by omitting disclosure of the Reinsurance Scheme in offering and selling the Travel Insurance Policies for the Insurer;

   c.  Whether Norwegian further concealed the omission by bundling the insurance and non-insurance products to lead the reasonable consumer to believe she was paying a pass-through charge to the Insurer for the Travel Insurance Policy;

   d.  Whether Norwegian received undisclosed kickbacks, commissions, or fees from the sale of the Travel Insurance Policies for the Insurer;

   e.  Whether and to what extent Norwegian's conduct has caused injury to the Plaintiffs and the other members of the Class;

   f.  Whether and to what extent Norwegian's unfair and deceptive practices are ongoing such that declaratory and/or injunctive relief are warranted.

### D.  **Typicality**

68.    Plaintiffs are members of the Class they seek to represent. Plaintiffs' claims are

typical of the respective Class claims because of the similarity, uniformity, and common purpose

of Norwegian's challenged misconduct conduct. Each Class member has sustained, and will

continue to sustain, damages in the same manner as Plaintiffs as a result of Norwegian's challenged

practices.

### E.  Adequacy of Representation

69.     Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of the Class members. Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel, highly experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a Class action.

70.     To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.  Requirements of Fed. R. Civ. P. 23(b)(3)

71.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on the common marketing and sales practices Norwegian utilized in its sale of the Travel Insurance Policies to Plaintiffs and the unnamed Class members.

72.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

73.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is in the case at bar, common questions will be held to predominate over individual questions.

### G. <u>Superiority</u>

74.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

    a.  Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside throughout the country;

    b.  Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

    c.  There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

    d.  The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

    e.  Individual suits would not be cost effective or economically maintainable as individual actions; and

    f.  The action is manageable as a class action.

### H. <u>Requirements of Fed. R. Civ. P. 23(b)(1) & (2)</u>

75.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

76.     Norwegian has acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

## COUNT I

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Alleged on behalf of the Class, or alternatively a Florida Subclass)

77.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

78.     This Count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201, *et seq*., Florida Statutes ("FDUTPA").

79.     FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

80.     At all material times, Plaintiffs and all members of the Class were consumers within the meaning of Section 501.203, Fla. Stat., and are entitled to relief under FDUTPA in accordance with Section 501.211, Fla. Stat.

81.     At all times material, Norwegian conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

82.     Norwegian's conduct of utilizing deceptive and unfair marketing and sales practices, including but not limited to representing the sale of the Travel Insurance Policy as a pass-through transaction while charging inflated amounts for the Travel Insurance Policies to Plaintiffs and the other members of the Class and taking unearned commissions therefrom, as well as representing the sale of the Travel Insurance Policy as a pass-through transaction while taking ceded premiums as a result of the Reinsurance Scheme that it has never disclosed to consumers, violates FDUTPA. Norwegian's challenged conduct was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA by defendants operating from within the State.

83.     Norwegian is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission. Further, it is not a bank or savings and loan association regulated by federal agencies.

84.     Norwegian is not an insurance company, nor is it a licensed provider of travel insurance under section 626.321(1)(c), Florida Statutes, nor does it have the necessary appointments pursuant to section 626.112(1)(a), Florida Statutes, for selling travel insurance products, and is therefore not regulated by the Office of Insurance Regulation of the Financial Services Commission or the Department of Financial Services.

85.     At all material times, Norwegian engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices:

    a.  Taking kickbacks, in the form of, among other things, unearned and undisclosed commissions from the sales of the Travel Insurance Policies in exchange for making Transamerica (before October 1, 2017) and/or Nationwide (from October 1, 2017 on) the exclusive travel insurance provider for the BTPP, and therefore charging an inflated price for the cost of the Travel Insurance Policies.

    b.  Taking kickbacks, in the form of, among other things, ceded premiums through the Reinsurance Scheme, as described at ¶¶ 7–9, *supra*.

    c.  Bundling the Travel Insurance Policies with non-insurance products into the BTPP and charging a single price for the BTPP, so consumers did not know what amounts they were paying for each of the three bundled products/services; and

    d.  Presenting the BTPP to create the impression that it was comprised of three pass-through charges: (1) the cost of the Cancellation Fee Waiver, (2) the cost of the Travel Insurance Policy, and (3) the cost of Travel Assistance, even though Norwegian took an unearned, undisclosed commission from the inflated price of the Travel Insurance Policy, and further even though Norwegian never disclosed the Reinsurance Scheme to consumers and the fact that, as a result of the Reinsurance Scheme, Norwegian ultimately kept almost the entire cost of the Travel Insurance Policy.

86.     The concealment and omissions of material facts and deceptions alleged in the foregoing paragraphs occurred in connection with Norwegian's trade and commerce in Florida.

87.     Plaintiffs and the other members of the Class have sustained actual damages in the form of Norwegian's kickbacks, which take the form of, among other things, significant unearned commissions and/or ceded reinsurance premiums from every Travel Insurance Policy sold, as a direct and proximate result of Norwegian's unfair and unconscionable practices. Section 501.211(2), Florida Statutes, provides Plaintiff and the other members of the Class a private right of action against Norwegian and entitles them to recover their actual damages, plus attorneys' fees and costs.

88.     Norwegian still utilizes many of the deceptive acts and practices described above and is still collecting kickbacks in the form of, among other things, significant unearned commissions and/or ceded reinsurance premiums from every Travel Insurance Policy sold. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Norwegian continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Class to obtain declaratory and injunctive relief to put an end to Norwegian's unfair and deceptive scheme.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, demand judgment against Norwegian for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT II

## UNJUST ENRICHMENT

### (Alleged on behalf of the Class, or alternatively a Florida Subclass)

89.     Plaintiffs re-allege paragraphs 1 through 76 as if fully set forth herein and further allege the following.

90.     Plaintiffs and each member of the Class conferred a direct benefit on Norwegian through their payments for the Travel Insurance Policies, allowing Norwegian to enrich itself to the detriment of Plaintiffs and the Class.

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

91.     Norwegian appreciated, accepted, and retained this benefit, as it garnered substantial profits by virtue of its insurance kickback scheme, including the ceded premiums taken as a result of the undisclosed and concealed Reinsurance Scheme.

92.     Under the circumstances, it would be unjust and inequitable to allow Norwegian to retain this benefit, as it was obtained through false and misleading representations.

93.     Plaintiffs and the class suffered damages as a result of Norwegian's unjust enrichment.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, demand an award against Norwegian in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Plaintiffs accordingly respectfully request that the Court enter its Orders and Judgment:

a.   Certifying this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3), Federal Rules of Civil Procedure, and appointing Plaintiffs as representatives of the Class(es), and appointing undersigned counsel as Class Counsel;

b.   Enjoining Norwegian from continuing the acts and practices challenged by the Plaintiffs, including an order requiring Norwegian to make full disclosure to consumers of its retention of Travel Insurance Policy premiums sold through the BTPP and the amount of the kickback it receives, including as a result of the Reinsurance Scheme described in ¶¶ 7–9, *supra*;

c.   Awarding Plaintiffs and the Class damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

d.   Restitution of all insurance premiums paid by Plaintiffs and members of the Class, as a result of the wrongs alleged herein, in an amount to be determined at trial;

e.   Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

f.   Awarding Plaintiffs and Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class Counsel and experts, and reimbursement of expenses;

g.   Awarding such other relief as the Court deems just, equitable and proper.

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: December 11, 2018.

Respectfully submitted,

By: */s/ Adam Moskowitz*

Adam Moskowitz, Esq.
Florida Bar No. 984280
adam@moskowitz-law.com
Howard M. Bushman, Esq.
Florida Bar No. 0364230
howard@moskowitz-law.com
Joseph M. Kaye, Esq.
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza
Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

Andrew S. Friedman
(*admitted Pro Hac Vice*)
afriedman@bffb.com
Francis J. Balint, Jr.
(*admitted Pro Hac Vice*)
fbalint@bffb.com
**BONNETT, FAIRBOURN, FRIEDMAN &**
**BALINT, P.C.**
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
Tel: (602) 274-1100
Fax: (602) 274-1199

Kimberly Lambert Adams
Florida Bar No. 14479
kadams@levinlaw.com
**LEVIN,     PAPANTONIO,     THOMAS,**
**MITCHELL,  RAFFERTY,  PROCTOR,**
**P.A.**
316 South Baylen St.
Pensacola, FL 32502

*Martha Phillips, et al. v. NCL Corporation LTD d/b/a Norwegian Cruise Lines*
*Amended Class Action Complaint*

Tel: (850) 435-7056
Fax: (850) 436-7056

William F. "Chip" Merlin, Jr.
Florida Bar No. 364721
cmerlin@MerlinLawGroup.com
**MERLIN LAW GROUP**
777 S. Harbour Island Blvd., Suite 950
Tampa, FL 33602
Telephone: (813) 229-1000
Facsimile: (813) 229-3692

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was filed on December 11, 2018 with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/Adam Moskowitz*_____